The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VOLODIMYR PIGIDA,<br><br>Defendant. | NO. CR 18-294 RSM<br><br>GOVERNMENT'S TRIAL BRIEF |

## I.    INTRODUCTION

In November 2018, the grand jury returned an Indictment against defendants Volodimyr Pigida and Marina Bondarenko. Dkt. 1. The Indictment charges Pigida with a total of 27 counts, including conspiracy (Count 1), wire fraud (Counts 2 through 17), mail fraud (Counts 18 through 21), bankruptcy fraud (Count 22), pre-petition concealment of property in a bankruptcy case (Count 23), false declaration in a bankruptcy case (Count 24), false oath and account in a bankruptcy case (Counts 25 and 26), and falsification of records in a bankruptcy case (Count 27). The charges stem from Pigida's operation of a work-from-home internet marketing business called Trend Sound Promoter (TSP). TSP, which had features of both a Ponzi and pyramid scheme, collapsed into bankruptcy after

Government's Trial Brief - 1
*United States v. Volodimyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

about fifteen months. During the ensuing bankruptcy proceedings, Pigida made multiple false statements in an effort to hide assets and misrepresent the reality of TSP's business.

Pigida's co-defendant, Bondarenko, accepted responsibility in 2019. Dkt. 45. She pleaded guilty to bankruptcy fraud as charged in Count 22, and the government agreed to dismiss the remaining counts against her. *Id*. In pleading guilty, she admitted, among other things, that she and Pigida created false documents in the bankruptcy proceedings when trying to justify millions of dollars that they had inappropriately taken from TSP for their personal benefit. *Id*. She also admitted that she misrepresented TSP's business in a civil case filed by TSP against a person who was saying TSP was a scam. *Id*. The Court sentenced Bondarenko to 38 months in prison. Dkt. 67.

Pigida's trial is scheduled to start on November 14, 2022. Assistant United States Attorneys Justin W. Arnold and Philip Kopczynski will represent the United States. The primary case agent at trial will be Postal Inspector Justin Lothyan from the U.S. Postal Inspection Service.[1] Assistant Federal Public Defenders Jesse Cantor and Gregory Murphy will represent Pigida.

Pigida has been released on bond. There are no pending motions in the case. The United States expects to call approximately 27 witnesses during its case-in-chief. The United States anticipates that it will present its case-in-chief in approximately six days, assuming reasonable cross-examination by the defense. The parties are discussing stipulations regarding foundational matters to streamline the presentation of evidence.

## II.    BACKGROUND

**A.    Facts**

In late 2012, Pigida formed TSP. TSP was registered as a corporation in both Washington and Florida under the name Trend Sound Promoter AMG Corp. Pigida

---

[1] In addition to being a case agent, Inspector Lothyan will testify for the government. As further described below, the government asks that the Court exempt Inspector Lothyan from any witness exclusion order so that he may sit at counsel table during trial.

Government's Trial Brief - 2
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

purportedly formed TSP to conduct advertisement promotion and music distribution through an internet platform. Pigida's now-wife, Bondarenko, was a part-owner of TSP in 2013 and 2014 and acted as TSP's vice president. Thus, Pigida and Bondarenko owned TSP and controlled its day-to-day operations. They established an office in Bellevue, Washington.

To fund TSP, Pigida sold "Ad-Promoting Packages" to individuals they called "Independent Promoter Distributors." In exchange for an upfront payment to TSP (of varying amounts ranging from $150 to $12,350), each promoter obtained a certain number of licenses to music tracks created by Pigida. More significantly, each promoter obtained the opportunity to send a number of promotional email marketing messages each weekday on behalf of TSP through TSP's website. The number of daily email addresses TSP provided to each promoter was tied to the price the promoter paid for his or her package. A promoter who purchased the cheapest package would receive significantly fewer email addresses than a promoter who purchased a package costing thousands of dollars. TSP agreed to pay the promoter $.40 for each daily email message the promoter sent on behalf of TSP. A promoter who sent all the allotted messages for a year could earn approximately four times the package purchase price. A promoter could also earn a bonus for referring new promoters to TSP. In response to this lucrative return for very little work, thousands of individuals throughout the United States, and overseas, bought Ad-Promoting Packages. Neither Pigida nor Bondarenko provided training or guidance to promoters on the marketing or distribution of music or TSP's other products or services. Promoters bought packages almost exclusively to be able to send daily emails and generate significant returns, a fact known to Pigida from the earliest days of TSP.

To recruit promoters and comfort them that TSP would be able to pay the significant returns he promised, Pigida falsely asserted to numerous promoters that TSP had several wealthy investors or sponsors, and that these investments funded the exorbitant payments to promoters for their email distribution activities. In addition,

Government's Trial Brief - 3
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Pigida and Bondarenko falsely asserted that payments to promoters for the email activity were being paid from revenue obtained from other sources, such as the sales of products, services, or advertising. In fact, TSP had no significant investors or sponsors and little revenue outside the purchase of Ad-Promoting Packages by promoters. During its operation, TSP operated as a Ponzi scheme, whereby Pigida simply used incoming funds from the purchase of new Ad-Promoting Packages to pay returns to prior promoters. During TSP's operations, approximately $22.6 million came into TSP. Out of this amount, $21.3 million, representing 94% of total revenue, came from the thousands of promoters who purchased Ad-Promoting Packages. TSP paid approximately $17.6 million to promoters for sending the daily emails.

At least by November 2013, Pigida and Bondarenko knew that the vast majority of the promoters were only engaged in sending emails on behalf of TSP and not promoting or selling music or TSP's other services. Between November 2013 and January 22, 2014, Pigida and Bondarenko changed TSP's terms and conditions and added specific music or other sales requirements for promoters to meet to receive their email commission payments. Despite these changes, Pigida did not enforce these requirements until early 2014. When Pigida began enforcing these requirements, individuals stopped buying Ad-Promoting Packages, thus drying up the only source that TSP and Pigida had to pay promoters' email commission payments. TSP offered discounted pricing on packages and promotional giveaways to try to generate additional revenue.

Around the same time, TSP's payments to promoters for earned email commissions slowed considerably. By March 2014, TSP had stopped paying most, if not all promoters. To quell promoters' concerns, Pigida falsely stated, and caused TSP's staff to falsely state, that: (a) the turn-around time on payments to promoters had increased; (b) checks would be forthcoming; or (c) checks were in the mail. Despite the inability to pay existing promoters, Pigida continued to recruit new promoters until the day TSP filed for

Government's Trial Brief - 4
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  bankruptcy. When recruiting these new promoters, Pigida did not disclose, or require

2  others to disclose, that TSP was unable to pay current promoters.

3      Knowing that TSP's demise was inevitable, Pigida and Bondarenko devised and

4  executed a plan to extricate themselves from TSP while maximizing their personal gain.

5  Between January 2013 and April 2014, Pigida and Bondarenko withdrew approximately

6  $3.3 million (from the $22.6 million described above) from TSP for their personal

7  benefit. Pigida and Bondarenko used these funds to purchase at least four properties,

8  three vehicles, and a boat. Pigida and Bondarenko withdrew these funds using a variety

9  of methods, including transferring funds to other corporate entities they owned, buying

10  real estate, paying for rent and other personal expenses, withdrawing cash, and making

11  international wire transfers. Pigida and Bondarenko transferred a significant amount of

12  these funds between late December 2013 and April 2014.

13      To conceal the money that they misappropriated from TSP, Pigida and

14  Bondarenko formed approximately 10 trusts between January 8, 2014, and January 30,

15  2014. After they formed the trusts, Pigida and Bondarenko used them to conceal their

16  transfer of funds from TSP and to conceal the assets purchased with those funds from the

17  promoters, who they were refusing to pay, and eventually from the bankruptcy court. For

18  example, using TSP funds, on or about January 17, 2014, Pigida and Bondarenko

19  purchased a condominium in the name of one of the trusts. Less than two weeks later, on

20  January 29, 2014, they purchased a lakefront home, again with TSP funds, in the name of

21  another trust. Pigida and Bondarenko also transferred the titles of at least two vehicles

22  and a boat (previously purchased with misappropriated TSP funds) into trusts on April

23  21, 2014, one day before retaining bankruptcy counsel and four days before TSP filed for

24  bankruptcy.

25      On April 25, 2014, TSP, through Pigida, filed a voluntary petition under Chapter

26  11 in the United States Bankruptcy Court for the Western District of Washington. In the

27  days leading up to the filing, Pigida and Bondarenko met with bankruptcy counsel to

Government's Trial Brief - 5
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

discuss the filing. A false and fraudulent statement of financial affairs, signed by Pigida, was attached to the voluntary petition. The statement of financial affairs falsely asserted that, other than salary, Pigida and Bondarenko had not transferred any property out of TSP in the two years prior to the filing for bankruptcy protection. In total, Pigida and Bondarenko attempted to conceal approximately $3,334,750 of TSP funds that had been transferred from TSP for their personal benefit during the mail and wire fraud scheme. Most of TSP's creditors in bankruptcy were promoters, the very victims who Pigida and Bondarenko concealed their misappropriation of TSP's assets from during the mail and wire fraud scheme. The promoters collectively lost millions of dollars in the scheme.

Despite their efforts to conceal this from the bankruptcy court and TSP's victim-creditors, the U.S. Trustee uncovered some of the fraudulent transfers described above. Specifically, the U.S. Trustee discovered that Pigida and Bondarenko had transferred over $1.5 million from TSP to buy the lakefront house and condominium described above. The U.S. Trustee also found that many of the facts and figures in TSP's filings were incomplete or unreliable. As a result, the U.S. Trustee filed a motion to convert the bankruptcy from a Chapter 11 to a Chapter 7 proceeding. In addition, the U.S. Trustee filed adversary proceedings to recover assets for the benefit of TSP's creditors.

Even after the U.S. Trustee uncovered the transfers, Pigida and Bondarenko continued to mislead the U.S. Trustee, the bankruptcy court, and TSP's victim creditors by, among other things, falsely asserting that these transfers of TSP funds for their personal benefit were: (1) payments pursuant to a license agreement between TSP and another company owned by Pigida; or (2) loan repayments to related companies that had loaned money to TSP. To bolster these false statements, Pigida created dozens of false and fictitious documents, including a license agreement, five quarterly invoices, 23 assignment letters, TSP board minutes, and loan agreements and invoices. Bondarenko,

Government's Trial Brief - 6
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  knowing they were false, signed a number of these documents, which were submitted to
2  the U.S. Trustee in defense of the U.S. Trustee's adversary proceedings.[2]

3       Furthering their fraud, Pigida and Bondarenko also continued to conceal from the
4  bankruptcy court, the U.S. Trustee, and TSP's victim creditors other significant transfers
5  of funds they had misappropriated from TSP, or the assets they had purchased using these
6  funds, even after the filing of the adversary proceedings. The bankruptcy proceedings
7  resolved in December 2017, and the full scope of conduct related to the mail, wire, and
8  bankruptcy fraud, including several other instances of fraudulently concealed assets, was
9  only uncovered through the criminal investigation that led to the Indictment in this
10 matter.

11 **B.    Procedure**

12      Pigida was charged in the Indictment on November 29, 2018. Dkt. 1. He first
13 appeared in the Southern District of Florida on December 4, 2018, and was released on
14 an appearance bond. Dkts. 7, 22. The Court appointed the Federal Public Defender and
15 ordered Pigida to pay $750 toward the cost of his defense each month. Dkt. 26. He has
16 remained on bond.

17                          **III.    LEGAL ISSUES**

18 **A.    The Law of Conspiracy**

19      Pigida is charged with conspiring with Bondarenko to commit the offenses of wire
20 fraud, mail fraud, and bankruptcy fraud. "One becomes a member of a conspiracy by
21 willfully participating in the unlawful plan with the intent to advance or further some
22 object or purpose of the conspiracy, even [if] the person does not have full knowledge of
23 all the details of the conspiracy." Ninth Circuit Model Jury Instruction § 11.1.

24

25

26

27

---

[2] As noted above, Bondarenko admitted this fraudulent conduct, among other things, as
part of her guilty plea to bankruptcy fraud in 2019. Dkt. 45.

Government's Trial Brief - 7
*United States v. Volodimyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 1.    Agreement and Knowledge

The agreement to accomplish an illegal object need not be a formal agreement. It is sufficient to show that the conspirators came to a mutual understanding to accomplish an unlawful purpose. *American Tobacco Co. v. United States*, 328 U.S. 781, 809 10 (1946); *United States v. Kiriki*, 756 F.2d 1449, 1453–55 (9th Cir. 1985). Indeed, the agreement "may consist of nothing more than a tacit understanding." *United States v. Mohr*, 728 F.2d 1132, 1135 (8th Cir. 1984).

An agreement constituting a conspiracy may be inferred from the acts of the parties, *see United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), *overruled on other grounds* in *United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (*en banc*), such as through evidence of coordinated activity between the defendants, *see United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992); *United States v. Cloud*, 872 F.2d 846, 852 (9th Cir. 1989). It is not necessary to show that each co-conspirator was aware of all the details of the conspiracy or of the parties involved. When one joins an illegal venture, one becomes part of the scheme although he or she may know only of his or her own share of wrongdoing. *Blumenthal v. United States*, 332 U.S. 539, 556–57 (1947); *Chavez v. United States*, 275 F.2d 813, 817 (9th Cir. 1960). Indeed, "once a conspiracy exists, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy." *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir. 1987).

### 2.    Evidence of Conspiratorial Conduct

"The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011); *accord United States v. Montgomery*, 384 F.3d 1050, 1061–62 (9th Cir. 2004) (acts that occurred within the temporal scope of the conspiracy and were inextricably intertwined with the conspiracy are not subject to Rule 404(b) analysis); *United States v. Ramirez-*

Government's Trial Brief - 8
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992). In addition, the government may prove a conspiracy through circumstantial evidence. *United States v. Castro*, 972 F.2d 1107, 1110 (9th Cir. 1992).

### 3.     Liability for Co-Conspirator Acts

It is a well-settled tenet of conspiracy law, known as *Pinkerton* liability, that "a party to an unlawful conspiracy may be held responsible for substantive offenses committed by his coconspirators in furtherance of the unlawful project, even if the party himself did not participate directly in the commission of the substantive offense." *United States v. Vasquez*, 858 F.2d 1387, 1393 (9th Cir. 1988); *see also Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946); *United States v. Olano*, 62 F.3d 1180, 1199 (9th Cir. 1995). For *Pinkerton* liability to apply, it is necessary that the substantive offense was within the scope of the unlawful agreement, was committed in furtherance of the conspiracy, and was reasonably foreseeable as a natural consequence of the unlawful confederation. *Pinkerton*, 328 U.S. at 647–48; *see also United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986) ("A co-conspirator is responsible for any act done in furtherance of the conspiracy unless it could not reasonably be foreseen as a natural consequence of the agreement."); *United States v. Reed*, 726 F.2d 570, 580 (9th Cir. 1984) ("The law is clear that a defendant may be convicted of the substantive acts of his co-conspirators, as long as those acts are committed pursuant to and in furtherance of the conspiracy.").

## B.     Reference to the Penalties that Pigida Faces

If convicted at trial, Pigida faces the potential of a lengthy prison sentence. "It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992); *see also Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished that it "had no sentencing function and should reach its verdict without regard to what sentence might be imposed"); *United States v. Reed*, 726 F.2d 570, 579

Government's Trial Brief - 9
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(9th Cir. 1984) (trial judge properly instructed jury that the "punishment provided by law for the offenses charged in the indictment are matters exclusively within the province of the court," and "[i]t should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused"). Information about penalties draws the attention of the jury away from its chief function as the trier-of-fact, opens the door to compromise verdicts, and confuses the issues to be decided. *Olano*, 62 F.3d at 1202. Accordingly, it would be improper for the defense to make any reference to Pigida's potential punishment in the presence of the jury at any point in the proceedings. References to penalties could be as overt as, "You understand the defendant is facing decades in prison if convicted," or more subtle, such as "the defendant is facing a lot of time," "this case has serious consequences for the defendant," "the defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come." All such references are improper.

## IV.    EVIDENTIARY ISSUES

### A.    Statements of the Defendant

The United States intends to introduce evidence regarding statements made by Pigida, including, among other things, statements that he made to TSP promoters and staff, as well as statements he made in TSP's bankruptcy proceedings. A defendant's own statements are admissible, non-hearsay admissions of a party-opponent when offered into evidence by the United States. *See* Fed. R. Evid. 801(d)(2)(A).

The United States may offer all, some, or none of a defendant's statements at trial under Rule 801(d)(2). A defendant, however, cannot use this rule to offer his own prior out-of-court statements. Rule 801(d)(2) is unavailable to a defendant, since he would be the proponent of the evidence and, where he seeks to introduce it, it is not offered against him. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988). As a result, the hearsay rule bars a

Government's Trial Brief - 10
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

defendant from introducing his own prior statements. *United States v. Mitchell*, 502 F.3d 931, 964–65 (9th Cir. 2007).

If Pigida wishes to tell his side of the story to the jury, he must take the stand and testify under oath and be subject to cross-examination. Indeed, even where the United States elicits the inculpatory portion of a defendant's oral statement from a witness, the defendant is not entitled to elicit any exculpatory portion on cross-examination. *Ortega*, 203 F.3d at 682. The rule of completeness (Fed. R. Evid. 106) has no place in this analysis because it applies only to written or recorded statements. *Id*. And for any written or recorded statements of Pigida, such as those he made in the bankruptcy proceedings, the United States will offer evidence that easily passes muster under Rule 106.

**B.      Prior Consistent Statements**

The government may offer prior consistent statements of promoter witnesses or others. All such statements are contained in discovery previously produced to the defense. Federal Rule of Evidence 801 provides that a prior out-of-court statement is not hearsay where:

> [t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . (B) is consistent with the declarant's testimony and is offered . . . (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground.

Fed. R. Evid. 801(d)(1)(B). Most of the events at issue in this case took place over eight years ago. Although it is only natural for memories to fade over time, some government witnesses may be attacked on cross-examination for having purportedly bad memories of key events. If the defense challenges the credibility of government witnesses on this basis, the government is entitled to elicit evidence of prior consistent statements, such as statements made during interviews with law enforcement agents, to rehabilitate the witnesses. Once admitted, prior consistent statements are substantive evidence. Fed. R. Evid. 801 Advisory Cmte. Notes; *Arizona v. Johnson*, 351 F.3d 988, 998 (9th Cir. 2003).

Government's Trial Brief - 11
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C.    Statements Offered for a Non-Hearsay Purpose**

A statement is hearsay if it is (1) an assertion that (2) is made out of court and (3) is offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Many out-of-court statements are not hearsay because they either are not assertions, or they are not offered to prove the truth of the matter asserted. *United States v. Oguns*, 921 F.2d 442, 449 (2nd Cir. 1990) (questions are not assertions and are thus not hearsay). Furthermore, many statements that meet the definition of hearsay are admissible under one or more of the many exceptions to the hearsay rule.

In this case, the United States may offer out-of-court statements, not to prove the truth of the matters asserted, but merely to give context to the defendant's statements. Therefore, the statements would not constitute hearsay within the definition of Rule 801. *United States v. Catano*, 65 F.3d 219, 225 (1st Cir. 1995) (informant's part of conversation with agent was not hearsay because it was offered for context and not to prove the truth of informant's statements). For example, the United States will offer evidence of questions posed to Pigida during the bankruptcy proceedings, which give context to his statements made in response.

**D.    Statements in Furtherance of the Conspiracy**

Under Federal Rule of Evidence 801(d)(2)(E), a statement made by a co-conspirator is admissible if the government establishes by a preponderance of the evidence: (1) the existence of a conspiracy; (2) the defendant's connection to it, and (3) that the statement was made during and in furtherance of the conspiracy. *Bourjailly v. United States*, 483 U.S. 171, 175 (1987); *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir. 1982). The statements themselves may help establish their admissibility and reliability under Rule 801(d)(2)(E). *See Bourjailly*, 483 U.S. at 175; *see also United States v. Schmit*, 881 F.2d 608 (9th Cir. 1989).

There must be some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement. *United States v. Gordon*,

Government's Trial Brief - 12
*United States v. Volodimyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

844 F.2d 1397, 1402 (9th Cir. 1988). Circumstantial evidence is sufficient. *See, e.g.*, *United States v. Mason*, 658 F.2d 1263, 1269 (evidence that defendant visited co-conspirator's residence just prior to time coconspirator advised he had drugs was sufficient to connect defendant to the conspiracy).

To satisfy the "in furtherance" requirement, the statement must be said to "further the common objectives of the conspiracy, or, set in motion transactions that [are] an integral part of the [conspiracy]." *United States v. Layton*, 720 F.2d 548, 555 (9th Cir. 1983) (internal quotation marks omitted), *overruled on other grounds*, *United States v. W.R. Grace*, 526 F.3d 499, 506 (9th Cir. 2008). Examples of "in furtherance" include: statements that keep a conspirator abreast of developments, *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987); induce continued participation, *United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir. 1977); allay fears, *Layton*, 720 F.2d at 557; explain co-conspirators' roles, *United States v. Moody*, 778 F.2d 1380, 1382–83 (9th Cir. 1985), *amended by* 791 F.2d 707 (9th Cir. 1986); or aim to avoid detection, *United States v. Sears*, 663 F.2d 896, 905 (9th Cir. 1981). The focus is typically on the declarant's intent in making the statement, not on its actual effect of promoting the goals of the conspiracy. *United States v. Zavala-Serra*, 853 F.2d 1512, 1516 (9th Cir. 1988); *Layton*, 720 F.2d at 557 n.5. It is not necessary that co-conspirator statements be made to another member of the conspiracy. *See Zavala-Serra*, 853 F.2d at 1516 (statements to government informant); *United States v. Taylor*, 802 F.2d 1108, 1117 (9th Cir. 1986) (statements to undercover FBI agent); *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover DEA agent); *United States v. Smith*, 623 F.2d 627, 631 (9th Cir. 1980) (statement to informant).

As described in a recent filing, the United States will offer out-of-court statements of Bondarenko under Rule 801(d)(2)(E). Dkt. 161. Bondarenko is a confessed co-conspirator who helped run TSP and perpetuate this fraud with Pigida, and she made numerous statements in furtherance of the conspiracy.

Government's Trial Brief - 13
*United States v. Volodymr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**E.    Statements by Agents or Employees**

The hearsay rule excludes statements "made by the [opposing] party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). As described in a recent filing, the United States will offer statements made by TSP staff while working for TSP. Dkt. 161. For example, at the direction of Pigida and Bondarenko, TSP staff made lulling statements to promoters who called in to ask about delays in payment. These statements are admissible under Rule 801(d)(2)(D).

**F.    Business and Governmental Records**

The government intends to offer into evidence business records from various sources, including from banks and TSP itself, among other sources. The business-records exception to the hearsay rule allows a record to be admitted if it is made at or near the time of the events set forth therein, by a person with knowledge, and is kept in the course of regularly conducted business activity, and if it is the regular practice of the business to make the record. Fed. R. Evid. 803(6). Any person familiar with the record keeping practices of the business who can identify the record at issue as having been made in the ordinary course of business is a sufficient foundational witness. Personal knowledge of the document is not required and does not affect its admissibility. *United States v. Pitman*, 475 F.2d 1335, 1337 (9th Cir. 1973); *see United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (the phrase "other qualified witness" is broadly interpreted to require "only that the witness understand the record-keeping system" at the particular business).

A record generated by a third party and received and relied upon in the ordinary course, such as an invoice, becomes a business record of the company relying upon it. *Id.* at 1333–34; *see United States v. Jawara*, 474 F.3d 565, 585 (9th Cir. 2007) ("[W]e would have no trouble concluding that a college in the United States was a proper custodian of its students' SAT results, even though the SAT results were actually prepared by another entity."). Incompleteness, ambiguities, and inaccuracies in business records go to the

Government's Trial Brief - 14
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  weight to be given the evidence, not to its admissibility. *See United States v. Catabran*,
2  836 F.2d 453, 458 (9th Cir. 1988).

3      The government has produced to Pigida copies of business records, as well as
4  custodian certifications under Rule 902(11), during discovery. The defense has not
5  objected to date, and the government does not anticipate the defense having a valid basis
6  to object to the admission of these records. Indeed, many of the business records in the
7  government's case will be TSP records that TSP's Chapter 7 bankruptcy trustee and
8  Pigida himself provided to the government. It is difficult to imagine a colorable objection
9  (at least as to foundation, if not relevance) for TSP's own records. The parties are
10  discussing foundational stipulations, as noted above, and the stipulations under discussion
11  would address the admissibility of business records under Rule 902(11).

12  **G.    Summary Charts**

13      The investigation and prosecution of this case has involved extensive review of
14  voluminous bank records, accounting records, and other documents. The government
15  intends to present some of this evidence through a forensic accountant and the case agent
16  in the form of summary testimony and charts. The government has provided the defense
17  with all the underlying materials and will provide drafts of each of these summary charts
18  in advance of trial.

19      Federal Rule of Evidence 1006 states that "[t]he proponent may use a summary,
20  chart, or calculation to prove the content of voluminous writings, recordings, or
21  photographs that cannot conveniently be examined in court." A party offering a summary
22  under Rule 1006 must establish that the underlying materials cannot be conveniently
23  examined in court, and that they are admissible at trial, as conditions precedent to
24  introduction of the summary into evidence. *Amarelu v. Connell*, 102 F.3d 1494, 1516 (9th
25  Cir. 1997). The proponent of a summary also must establish that the underlying
26  documents were made available to the opposing party for inspection. *Paddack v. Dave*
27  *Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984). Summaries must fairly represent

Government's Trial Brief - 15
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the underlying documents, and their admission into evidence is left to the trial court's discretion. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir. 1985), *superseded on other grounds by Northrup Corp. v. Triad Intern. Mktg.*, 842 F.2d 1154 (9th Cir. 1988).

All these requirements are met in this case. If the government were to publish all the relevant bank records, accounting records, and other documents, the jury would be faced with reviewing thousands of pages of material. Much of the accounting information is contained in large spreadsheets that are impractical to review in court. The government has long since provided the defense with copies of all the underlying records. And the summary testimony and charts are accurate and non-prejudicial.

Rule 1006 does not require that it literally be impossible for the fact finder to examine the underlying records before a summary may be admitted. *United States v. Stephens*, 779 F.2d 232, 238–39 (5th Cir. 1985); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979). Rather, Rule 1006 contemplates that summaries of voluminous records may be used without introducing each and every underlying document into evidence. *Scales*, 594 F.2d at 562. Furthermore, the fact that some of the underlying documents may be admitted in evidence does not mean that they can be "conveniently examined in court." *Stephens*, 779 F.2d at 239; *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir. 1983).

The Ninth Circuit has affirmed the admission as substantive evidence of a wide variety of summary charts pursuant to Rule 1006 where (as in this case) such charts are based on the sponsoring witnesses' out-of-court review of voluminous evidence. *See, e.g.*, *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (chart summarizing information about telephone calls made to and from phones associated with defendants, relying on review of phone records, rental records, jail records, and other information); *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (chart summarizing phone records and law enforcement surveillance reports); *Catabran*, 836 F.2d at 456–58 (charts

Government's Trial Brief - 16
*United States v. Volodymr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

summarizing voluminous computer printouts and inventory records in bankruptcy fraud prosecution); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (chart summarizing assets, liabilities, and expenditures of defendant in tax prosecution).

**H.    Exclusion of Witnesses**

Pursuant to Federal Rule of Evidence 615, the government respectfully requests that witnesses be excluded from the courtroom, with the exception of Inspector Lothyan, who is a case agent and who should be permitted to sit at counsel table. *United States v. Thomas*, 835 F.2d 219, 222–23 (9th Cir. 1987); *see also United States v. Machor*, 879 F.2d 945, 953–54 (1st Cir. 1989).

## V.    FORFEITURE

The United States seeks to forfeit from Pigida a sum of money reflecting the proceeds obtained from his commission of Counts 1 through 21. All proceeds of these offenses are forfeitable pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c).

The United States expects the evidence at trial will establish that Pigida obtained approximately $3.3 million in proceeds from the conspiracy offense (Count 1). The conspiracy charge covers the same time period as the other offenses and encompasses the same proceeds. If Pigida is convicted of the conspiracy offense, therefore, the United States will seek forfeiture based on that offense—i.e., it will ask the Court to enter a forfeiture money judgment against Pigida in the approximate amount of $3.3 million. If, however, Pigida is not convicted of the conspiracy offense, but is convicted of other charges, the United States will seek to forfeit a sum of money reflecting the proceeds from, and/or property involved in, those other offenses of conviction.

As required by Federal Rule of Criminal Procedure 32.2(a), the United States provided notice to Pigida of its intent to seek forfeiture in the Indictment. Dkt. 1.

**A.    Legal Standard for Forfeiture**

Criminal forfeiture is a form of punishment that is imposed as part of a criminal sentence. *Libretti v. United States*, 516 U.S. 29, 39–40 (1995). For the government to

Government's Trial Brief - 17
*United States v. Volodimyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

criminally forfeit property, there must be a predicate criminal conviction, a statute authorizing forfeiture for the crime of conviction, and evidence to support the statutorily required nexus between the property and the crime of conviction. *See, e.g.*, *United States v. Garcia-Guizar*, 160 F.3d 511, 518–20 (9th Cir. 1998) (reviewing these requirements). With respect to the required nexus, the government must establish the forfeitability of the relevant property by a preponderance of the evidence. *United States v. Martin,* 662 F.3d 301, 307 (4th Cir. 2011); *see also United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997); *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1576–77 (9th Cir. 1989). In other words, depending on the relevant forfeiture statute, the government must present evidence that establishes the relevant property is, "more likely than not," forfeitable as proceeds of the crime, property that facilitated the crime, and/or property involved in the crime. This lower standard of proof "is constitutional because the criminal forfeiture provision does not itself describe a separate offense but is merely an 'additional penalty' for an offense that must be proved beyond a reasonable doubt." *Garcia-Guizar*, 160 F.3d at 518 (quoting *Hernandez-Escarsega*, 886 F.2d at 1577).

Here, there is statutory authority, pursuant to 18 U.S.C. § 982(a)(2)(A) and 28 U.S.C. § 2461(c), to forfeit the proceeds that Pigida obtained from the offenses charged in Counts 1 (conspiracy to commit wire fraud, mail fraud, and bankruptcy fraud), Counts 2 through 17 (wire fraud), and Counts 18 through 21 (mail fraud).[3] Indeed, forfeiture upon a conviction is mandatory. *See* 28 U.S.C. § 2461(c) (providing the court "shall order" forfeiture when sentencing a defendant on these charges); 18 U.S.C. § 982(a)(2)(A) (same).

---

[3] Under 28 U.S.C. § 2461(c), criminal forfeiture is authorized whenever civil forfeiture is available. And civil forfeiture is available for the proceeds of wire and mail fraud, or a conspiracy to commit the same. *See* 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7), 1961(1). In addition, under 18 U.S.C. § 982(a)(2)(A), criminal forfeiture is authorized for wire or mail fraud affecting a financial institution.

Government's Trial Brief - 18
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The United States seeks to forfeit these proceeds in the form of a "personal money judgment" entered against Pigida. *See* Fed. R. Crim. P. 32.2(b)(1)(A); *United States v. Nejad*, 933 F.3d 1162 (9th Cir. 2019) (affirming a district court's authority to enter forfeiture money judgments and reciting circuit precedent). The government typically seeks a money judgment when the defendant has spent or otherwise disposed of the criminal proceeds, so they are no longer available to forfeit directly. *Nejad*, 933 F.3d at 1165 (recognizing the necessity of forfeiture money judgments in this circumstance and holding "a contrary rule . . . would allow an insolvent defendant to escape the mandatory forfeiture penalty Congress has imposed simply by spending or otherwise disposing of his criminal proceeds before sentencing").

**B.    Forfeiture Process**

The Federal Rules of Criminal Procedure set the procedures for determining the forfeitability of property in a criminal case. Forfeitures are decided after a guilty verdict is returned on a count that supports the forfeiture. Fed. R. Crim. P. 32.2(b)(1)(A). At that juncture, the specific question for the fact finder is "whether the government [has established the] requisite nexus between the property and the offense." *Id*. Although a defendant has a right for a jury to determine the forfeitability of most property, no such right exists for a forfeiture money judgment. In the case of a money judgment, it is the Court that determines the amount. *Id.* ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."); *see also United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) ("Rule 32.2 does not entitle the accused to a jury's decision on the amount of the forfeiture"); *United States v. Phillips*, 704 F.3d 754, 771 (9th Cir. 2012) ("Given that the only issue here was a monetary forfeiture, no jury determination was necessary.").

As forfeiture is determined post-conviction, and is considered part of sentencing, the rules of evidence do not strictly apply to forfeiture proceedings. The Court may consider any evidence that is "relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). This

Government's Trial Brief - 19
*United States v. Volodymyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 includes any evidence presented by the parties during trial on the substantive criminal

2 offenses. *Id.* ("The court's determination may be based on evidence already in the

3 record"); *United States v. Newman*, 659 F.3d 1235, 1244–45 (9th Cir. 2011) (same).

## VI.   CONCLUSION

The government is not aware of other legal or evidentiary issues that are likely to arise during this trial and that require the Court's attention at this juncture. If other issues do arise, the government requests the opportunity to address them in a supplemental brief or briefs.

DATED:  October 31, 2022.

NICHOLAS W. BROWN
United States Attorney

*s/ Justin W. Arnold*
JUSTIN W. ARNOLD
PHILIP KOPCZYNSKI
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Phone: (206) 553-5558
Fax: (206) 553-2502
Email: Justin.Arnold@usdoj.gov

Government's Trial Brief - 20
*United States v. Volodimyr Pigida* / CR 18-294 RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970